STATE OF CONNECTICUT *v.* MICHAEL PARROTT
(SC 16756)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 26, 2002—officially released January 7, 2003

*David V. DeRosa*, special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's

attorney, and *Anne F. Mahoney*, assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Michael Parrott, appeals from the judgment of conviction, rendered after a jury trial, of one count each of the crimes of assault in the first degree in violation of General Statutes § 53a-59 (a) (5),[1] burglary in the first degree in violation of General Statutes § 53a-101 (a) (1),[2] attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49[3] and 53a-134 (a) (2),[4] and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1997) § 53a-217c.[5] On appeal, the

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

[3] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[5] General Statutes (Rev. to 1997) § 53a-217c (a) provides: "A person is guilty of criminal possession of a pistol or revolver when he possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony or of a violation of subsection (c) of section 21a-279, section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d, (2) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (3) has been confined in a hospital for mental illness, as defined in section 17a-495, within the preceding

defendant claims that: (1) the trial court violated his right to the effective assistance of counsel as guaranteed by the sixth amendment to the United States constitution by failing to inquire into a conflict of interest between the defendant and his trial counsel when the trial court knew or should have known about the conflict; and (2) the comment by the state's attorney on the defendant's decision not to testify violated the defendant's rights under the fifth amendment to the United States constitution and provisions of General Statutes § 54-84 (a). We disagree with the defendant's claims, and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 2, 1998, Fred Anderson, the victim, drove his car and met up with Juan Maldonado. The two men proceeded to drive around for awhile and sell drugs together. A short time thereafter, Anderson saw the defendant, who was known to Anderson as "Mike" or "O.G.," walking on the street. The defendant subsequently got into Anderson's car. Stopping only once briefly at the house of the defendant's girlfriend, Anderson, Maldonado and the defendant then drove around together until 2 or 3 o'clock in the morning. Anderson then dropped the defendant and Maldonado off at their respective houses before returning to his house in Hartford, where he resided with his girlfriend, Donnette Williamson, and Williamson's three children.

After having been dropped off, Maldonado went to bed, but was awakened about one-half hour later by

twelve months by order of a probate court, (4) knows that he is subject to a restraining or protective order issued by a court, after notice and an opportunity to be heard has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person or (5) is an alien illegally or unlawfully in the United States. For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

the defendant, who was knocking loudly on the windows and doors of his home. Maldonado looked outside and saw that the defendant had returned in a white car driven by a third person known to Maldonado only as "Fat Boy." Maldonado went to the door and the defendant told Maldonado to come out for a ride. Maldonado left his house and got into the car with the defendant and "Fat Boy."

"Fat Boy" drove the car to Plainfield Street, one street behind the street where Anderson resided, and parked the car. Before exiting the car, the defendant produced a handgun and told Maldonado that he and "Fat Boy" planned to rob Anderson. The defendant and "Fat Boy" put on black masks and the three men got out of the car. After leaving the vehicle, they jumped a fence onto Anderson's property and approached the front door. The defendant pointed the gun at Maldonado and insisted that Maldonado knock on the front door and ring the doorbell while the defendant and "Fat Boy" crouched on either side of the door of Anderson's house. At this time, Maldonado saw that "Fat Boy" also was armed.

Williamson was awakened by the doorbell, went to the door and asked who was there. Maldonado told Williamson through the closed door that he was stranded and asked to be let in. Williamson did not recognize Maldonado's voice and went to get Anderson.

Anderson and Williamson then went to the front of the house and Anderson looked out of a front window. He had a brief verbal exchange with Maldonado, whom he recognized, and also noted that there was an armed man crouching behind Maldonado. Maldonado asked repeatedly to be let into Anderson's home. Anderson told Maldonado to leave immediately and instructed Williamson to call the police. Anderson then pressed the "panic switch" of his burglar alarm system. At this

moment, the defendant stood up and fired gunshots through the front door. The defendant then entered Anderson's house.

One bullet fired from the defendant's gun struck Anderson in his left arm and another bullet traveled through the door of the bedroom where Williamson's young daughters were sleeping. Anderson retreated into the house and the defendant followed him, through several rooms and into the bedroom he shared with Williamson, where the defendant shot at Anderson again. Anderson retreated to an open closet, but was caught by the defendant. The two men struggled, and Anderson grabbed the defendant's arms in order to avoid being shot at again. While they struggled, the defendant repeatedly demanded to know where Anderson kept his money.

Anderson recognized the voice and body build of his assailant as belonging to the defendant, whom Anderson had known for approximately ten years, and with whom he earlier had passed the evening. Anderson also recognized the defendant's clothes as being those worn by the armed person who had crouched behind Maldonado at the front door. The two men continued to struggle and the defendant repeatedly demanded that Anderson let go of the gun. When Anderson's arm finally gave out, he fell to the floor, at which time the defendant shot him in the hip. The defendant then fled from Anderson's house. The police arrived shortly thereafter and, Anderson told an officer on the scene that it was the defendant who had shot him.

The defendant subsequently was arrested and charged with the offenses for which he was later convicted.[6] After his conviction, the defendant appealed from the judgment of the trial court to the Appellate

---

[6] Although the defendant was charged with two counts of assault in the first degree, he ultimately was convicted of only one of the two counts.

Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

The defendant first claims that the trial court violated his sixth amendment right to the effective assistance of counsel by failing to inquire into the decision by the defendant's trial counsel (defense counsel) to sit a distance of eight to ten feet away from the defendant during voir dire. The defendant maintains that defense counsel's positioning violated the attorney's duty of loyalty to the defendant and represented a potential conflict of interest into which the trial court had a duty to inquire. The defendant further urges that this deprivation of his right to the effective assistance of counsel was such that an automatic reversal of his conviction is warranted under federal and Connecticut case law. In response, the state argues that defense counsel's distance from the defendant during voir dire represented only a potential conflict of interest[7] and that the trial court's inquiry into the conflict was wholly adequate. Pursuant to the holding of the United States Supreme Court in the recent case of *Mickens* v. *Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002), the state also asserts that, because the defendant has not shown that the "conflict" between defense counsel and the defendant resulted in any deficiency in counsel's performance during voir dire or at trial, the defendant's first claim must fail. We agree with the state.

The following additional facts are relevant to our resolution of this issue. On the third day of voir dire,

---

[7] In his briefs filed with this court, the defendant's appellate counsel refers to the conflict of interest between the defendant and his trial counsel as both "actual" and "potential." We agree with the state that the circumstances presented, at most, a potential conflict of interest.

after a brief recess was taken so that the defendant could change out of prison garb and into "street clothes,"[8] a strain between the defendant and defense counsel became apparent. This tension was evidenced by the fact that, rather than taking a seat next to the defendant at counsel table, defense counsel sat approximately eight to ten feet away from his client. Later, outside the presence of any venireperson, the defendant informed the court of his dissatisfaction with this arrangement.[9] Defense counsel stated that he had chosen to sit some distance from his client for "security purposes." He declined to elaborate further on what had transpired between them explaining that he was concerned that further detail might prejudice the court against the defendant. Defense counsel assured the trial court, however, that he would be able to communicate with his client throughout the voir dire.[10] The defendant responded that he was not as concerned about being able to communicate with his attorney as he was about the appearance of their seating arrangement, stating to the court: "It's about how it looks to the jury if he's supposed to represent me. How's that look if he doesn't

---

[8] The defendant and defense counsel apparently disagreed about the appropriateness of the defendant appearing in prison garb during voir dire. Defense counsel wanted the defendant to wear street clothes, but the defendant was not comfortable with the street clothes that had been provided.

[9] The following colloquy occurred between the defendant and the court:

"The Defendant: May I say one thing, Your Honor? [Defense counsel] was worried about my—

"The Court:—attire.

"The Defendant: Attire. How I would look to the jury. I don't think that looks too good with him sitting five feet away from me if he's supposed to be representing me in front of the jury."

[10] Defense counsel stated to the court: "Well, I would just ask to proceed, Your Honor, and let me conduct things as I see fit. Because, otherwise, we are going to have to put on the record a verbatim scenario of what occurred downstairs and why I feel it is absolutely necessary for me to remain in this position. If I do that, it will prejudice the defendant in the court's eyes and certainly is not going to help him with the case. So, I mean, regardless of where I sit for security purposes, I don't think it will have any effect. I can communicate with [the defendant]."

want to sit next to me but he wants to be my lawyer and take my money?"

The trial court expressed its concern about the situation and acknowledged that conflicts often develop between clients and their counsel during the emotionally charged process of a trial. The trial court suggested that defense counsel take a seat at the table beside his client.[11] Defense counsel declined to reposition himself, and indicated to the trial court that he was not "looking to be released from representation in this case . . . ." Defense counsel further stated, however, that he wanted to sit with "two sheriffs in between us" and that they could "communicate in writing or behind glass." The trial court then asked the defendant if he wanted defense counsel to continue representing him. The defendant reiterated his concern about his attorney's location but stated that he wanted to retain him as counsel. A brief discussion about the conflict ensued.[12]

---

[11] The following colloquy occurred:

"The Court: . . . [Y]ou know between clients and attorneys differences develop, and you just have to discuss them out. And I know that in the course of a trial, particularly someone charged, can be, you know, under considerable pressure, just as you put it.

"And so—but it is always best to try at least to just remain calm and discuss things out as best you can . . . .

"But I understand—I know that sometimes, obviously, discussion can get a bit heated and so on, and, certainly, I recognize that certainly this is a very important matter, and we all understand that, so. But perhaps if you just move over to the table . . . .

"[Defense Counsel]: Well, I feel comfortable where I am, Your Honor."

[12] The following colloquy occurred among defense counsel, the defendant and the court:

"The Defendant: I want this man to represent me but not like that. That's not helping me. I caught—I said that I felt he had a bit of cowardice in him. I expressed it to him in front of these two, three men here. That makes him look like a coward to me.

"[Defense Counsel]: That was not the comment.

"The Defendant: I am talking about that right now.

"[Defense Counsel]: That's not the comment that makes me think I would rather be eight feet [away].

"The Defendant: What you afraid of if you don't have cowardice in you?

"[Defense Counsel]: That isn't the—

Defense counsel assured the court that he "absolutely" could represent the defendant adequately and the trial court subsequently decided to "see how it develop[ed]."[13] On the first day of trial, defense counsel informed the court that the situation that had led to his decision to sit apart from his client had been resolved.[14]

We begin our analysis of the defendant's claim by setting forth the applicable standard of review. "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 687–88, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); *State* v. *Munoz*, 233 Conn. 106, 131 n.16, 659 A.2d 683 (1995). "On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel." (Emphasis in original.) *State* v. *Crespo*, supra, 688; see *State* v. *Webb*, 238 Conn. 389, 414 n.24, 680 A.2d 147 (1996); *State* v. *Martin*, 201 Conn. 74, 83, 513 A.2d 116 (1986). "We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for

---

"The Defendant: Whatever it is to you, it is jail to me. I am locked up.

"The Court: Well, let's just—do you feel you can represent this man's interest adequately proceeding as you are proceeding?

"[Defense Counsel]: So far, Your Honor, absolutely. I don't see why not."

[13] A review of the record reveals that two jurors and two alternates were selected while defense counsel sat at some distance from the defendant.

[14] Defense counsel stated to the court: "[The defendant] and I have resolved our differences and there isn't any problem in that regard . . . ." In the absence of evidence to the contrary, we infer from this statement that defense counsel once again sat next to the defendant at counsel table and remained there throughout the trial.

review or the issue presented was a question of law, not one of fact requiring further evidentiary development." *State* v. *Crespo*, supra, 688; see *State* v. *Webb*, supra, 414 n.24. We, therefore, review the defendant's claim as a question of law and, as with all questions of law, our review is plenary. See, e.g., *AvalonBay Communities* v. *Plan & Zoning Commission*, 260 Conn. 232, 240, 796 A.2d 1164 (2002); *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 14, 776 A.2d 1115 (2001).

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). *Festo* v. *Luckart*, supra, 626–27. . . . [O]ne of the principal safeguards of this right is the rule announced by this court that [a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict . . . . *Festo* v. *Luckart*, supra, 629." (Internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 685–86.

"There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial; *Holloway* v. *Arkansas*, 435 U.S. 475, 488, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . . *Cuyler* v. *Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's con-

viction. *Holloway* v. *Arkansas*, supra, 488. In the absence of an affirmative duty by the trial court to inquire, however, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance in order to obtain reversal of his conviction. *Cuyler* v. *Sullivan*, supra, 348; *Festo* v. *Luckart*, supra, 191 Conn. 626–31." (Internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 686.

"In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) Id., 689. In its recent decision in *Mickens* v. *Taylor*, supra, 535 U.S. 171, 174 the United States Supreme Court reaffirmed the general rule that, in order to demonstrate a sixth amendment violation based on the trial court's failure to inquire into a potential conflict of interest about which it knew or should have known, a defendant must establish that the conflict of interest adversely affected his counsel's performance.[15] The Supreme Court further rejected the habeas petitioner's claim that the trial judge's failure to inquire into a potential conflict of interest required automatic reversal of his conviction or relieved him of his burden of demonstrating that the conflict adversely affected his lawyer's performance.

In analyzing the defendant's claim in the present case, we are guided by our previous definition of an attorney's conflict of interest. "We have described an attorney's conflict of interest as that which impedes his paramount

---

[15] The Supreme Court decided *Mickens* during the pendency of the present appeal. Both the state and the defendant filed supplemental briefs addressing the applicability of *Mickens* to the present case.

duty of loyalty to his client. . . . Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 689–90; *Phillips* v. *Warden*, 220 Conn. 112, 139, 595 A.2d 1356 (1991). Although the weight of federal and Connecticut authority with regard to conflicts of interest focuses on cases where an attorney represents codefendants charged in connection with the same incident, this court concluded in *Phillips* that the term conflict of interest should be interpreted more broadly.[16]

We are persuaded that, in the present case, the facts presented a potential conflict of interest between the defendant and defense counsel. The evident concern of defense counsel for his own personal safety and his decision to sit apart from the defendant called into question whether he could discharge "his paramount duty of loyalty to his client." *State* v. *Crespo*, supra, 246

---

[16] In *Phillips* v. *Warden*, supra, 220 Conn. 140, we were faced with a unique situation in which a criminal defendant, who had been convicted of sexual assault, unlawful restraint and burglary "arising out of a factual scenario of terrible violence against an elderly woman," petitioned for a writ of habeas corpus for ineffective assistance of counsel because he had been represented at trial by Bernard L. Avcollie, an attorney who had been convicted of the notorious crime of having strangled his wife to death. Avcollie, who was appealing his conviction, had been tried and convicted in the same judicial district where the petitioner's trial took place. Id. This court stated that "[s]urely, no other attorney in the history of Connecticut or American jurisprudence has ever brought with him to the criminal jury courtroom the potential for prejudice to his client that Avcollie brought to the . . . courtroom . . . . Under these unique factual circumstances, we are constrained to conclude that there was a constitutionally impermissible risk that the petitioner's jurors would identify Avcollie's status as a convicted murderer with his client's status as an accused rapist, kidnapper and burglar, and that they would transfer to the petitioner the distaste or revulsion that they may have felt for his lawyer." Id., 141.

Conn. 689. The trial court, therefore, properly perceived the potential for a conflict of interest.

Contrary to the defendant's contention, however, the trial court did inquire into the potential conflict between the defendant and defense counsel. As a result of that inquiry, the trial court learned, first, that the defendant and defense counsel could communicate during voir dire and, second, that the defendant wanted defense counsel to continue to represent him, although he also wanted counsel to sit next to him. The trial court further was assured by defense counsel, an experienced criminal defense lawyer, that he "absolutely" could represent his client adequately. We conclude that the trial court's inquiry into the potential conflict of interest was sufficient under the circumstances.

Moreover, the defendant made no claim during voir dire or trial that defense counsel's performance was deficient and he makes no such claim before this court, despite the United States Supreme Court's recent reiteration in *Mickens* that a defendant must establish that any conflict of interest had a significant adverse affect on his attorney's performance. *Mickens* v. *Taylor*, supra, 535 U.S. 171, 174. We find it telling that the defendant seeks automatic reversal of his conviction without any assertion that his representation at trial was inadequate. Although the defendant makes no such claim, we note that any claim of deficient performance by his defense counsel is belied by the record in this case, which reveals that the differences between the defendant and his counsel were short-lived, in that they resumed sitting together at counsel table when the presentation of evidence began, and defense counsel advocated zealously for the defendant throughout the trial, even during that period of the voir dire when he allegedly was concerned for his personal safety.

The defendant further urges this court to exercise its supervisory authority over the administration of justice

to require that when a trial court knows or should know that there may be a conflict of interest between the defendant and defense counsel, the trial court must inquire into the conflict, and that when the trial court fails to do so, prejudice is to be presumed such that automatic reversal is required. We decline the defendant's request because we have concluded that the trial court in the present case adequately inquired into the potential conflict of interest that was presented.

## II

The defendant next claims that the prosecutor engaged in harmful prosecutorial misconduct in violation of the fifth amendment to the United States constitution and General Statutes § 54-84 (a)[17] by commenting on the defendant's decision not to testify during the trial.[18] In response to the defendant's constitutional claim, the state argues that: (1) the jury would not have understood the state's attorney's comment as having invited an adverse inference with respect to the defendant's failure to testify; and (2) even if this court were

---

[17] General Statutes § 54-84 provides: "(a) Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence."

[18] The defendant asserts that if we determine that his statutory claim was not preserved at trial, the claim should be reviewed under the plain error doctrine. "Under the plain error doctrine, we may reverse a criminal conviction when prosecutorial misconduct has so pervade[d] the defendant's trial as to have impaired the effectiveness or integrity of the judicial process." *State* v. *Satchwell*, 244 Conn. 547, 556 n.13, 710 A.2d 1348 (1998); *State* v. *Atkinson*, 235 Conn. 748, 769, 670 A.2d 276 (1996). The defendant's statutory claim was not preserved at trial. Although the defendant makes the conclusory assertion that he is entitled to prevail on this unpreserved claim under the plain error doctrine, he did not adequately brief the issue. Accordingly, we do not address it.

to determine that the comment was impermissible, it constituted harmless error and is not grounds for reversal. We conclude that, although the state's attorney's remark was improper, it did not violate the defendant's fifth amendment rights.

The following additional facts are relevant to our resolution of this claim. During closing argument, defense counsel referred to that portion of Anderson's testimony in which he made reference to the physical size of the defendant and how Anderson was able to identify the defendant, despite the fact that his assailant wore a mask. Defense counsel questioned the reliability of such an identification because Anderson had been under the influence of alcohol and drugs at the time of the attempted robbery and had claimed that he had been able to identify his masked assailant as the defendant by the feel of his attacker's arms and chest during their struggle. Counsel further argued that Anderson had testified that he and his assailant were of similar size and build. Defense counsel then commented that there was no evidence presented that the defendant's appearance had changed since the crime had taken place and that the defendant had a build more like that of defense counsel than that of Anderson.[19] The state objected to this latter statement on the ground that defense counsel had commented on facts that were not in evidence. Defense counsel responded that he merely was making

[19] The transcript reveals the following statement from defense counsel: "You know, one thing I was thinking of during this trial that, or during the testimony of Fred Anderson, Anderson can't even properly describe the defendant now as he sits here in court, as he sat here for a couple weeks in front of you. I thought I heard him say he and the defendant are about the same size. Well, first of all, there's no evidence in the record, in this record, there's no evidence that their respective heights and weights were any different [nineteen] months ago than they are now, that is, Fred or the defendant. I mean, we have to assume because there is no evidence to the contrary, that they looked about the same then as they do now. The defendant—and, again, this is for you, the defendant stood up during this trial. You have seen him. He looks to be about perhaps my height."

observations and had made permissible comment on the defendant's appearance. The state then remarked that "[t]he defendant didn't take the stand . . . ."

After the jury had been excused, defense counsel made an oral motion for a mistrial, arguing, inter alia, that the state's comment on the defendant's failure to testify was prejudicial. The state's attorney responded that defense counsel's remarks had gone well beyond mere comment on the defendant's appearance and as such "[were] clearly within the bounds of objectionable material . . . ."

The trial court denied defense counsel's motion for a mistrial, and determined that any impropriety could be cured by an appropriate jury instruction.[20] Defense counsel did not request a specific curative instruction that went beyond the court's proposed general instruction concerning the defendant's right not to testify.[21]

"We recently have reiterated the legal principles relevant to our review of [a claim of a prosecutor's improper comment on a defendant's decision not to testify]. It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution.

[20] In denying the defendant's motion for a mistrial, the trial court stated: "Now, of course, again, any reference to someone not testifying, to a defendant not testifying, is improper, and the court recognizes that. However, the court, again, can give a curative instruction and, in fact, the court—as you both know, the court will be instructing the jury that the jury is to draw no unfavorable inference from the failure of the defendant to testify. It certainly would seem that that would deal with the comment made by . . . the state's attorney in terms of obviating any substantial or irreparable prejudice to the defendant's case."

[21] The trial court instructed the jury as follows: "In this particular case, ladies and gentlemen, the defendant . . . has not testified. An accused person has the option to testify or not to testify at trial. He is under no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's not having testified in this case."

*Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). . . . Our legislature has given statutory recognition to this right by virtue of its enactment of . . . § 54-84. In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 570–71, 710 A.2d 1348 (1998).

The Appellate Court addressed a similar comment in *State* v. *Cobb*, 27 Conn. App. 601, 606–607, 605 A.2d 1385 (1992). In an objection addressed to the trial court, the state's attorney in *Cobb* remarked on the defendant's failure to testify. The Appellate Court stated that "[a]lthough made while the jury was in the courtroom, the comments in the present case were directed to the court, not to the jury. While this fact alone would not excuse an egregious violation of the rule, it is properly taken into consideration as part of the context in which it is made. An indirect comment in argument to the court on a point of law is less serious than a comment in jury summation that asks the jury to infer that the defendant's silence is evidence of guilt." Id., 607.

"In determining the effect of the state's words on the jury, we may consider the effect they had on defense counsel." Id., 608–609. Although defense counsel did

voice an objection to the state's comment by requesting a mistrial, he did not request a curative instruction, even though the trial court offered to defense counsel the opportunity to make such a request. From defense counsel's silence, we infer that the general instruction offered by the trial court was considered sufficient to protect the defendant's constitutional right not to testify.

In the present case, the prosecutor's improper remark was directed to the trial court and not to the jury. The comment was made in the context of argument over an objection, and, although the comment was clearly inappropriate, defense counsel did not specifically request a specific curative instruction. The trial court nevertheless properly instructed the jury that it should not draw any unfavorable inference from the defendant's failure to testify. See footnote 21 of this opinion. "Barring contrary evidence, we must presume that juries follow the instructions given them by the trial judge." (Internal quotation marks omitted.) *State* v. *Lewis*, 60 Conn. App. 219, 232, 759 A.2d 518, cert. denied, 255 Conn. 906, 762 A.2d 911 (2000); accord *Mulligan* v. *Rioux*, 229 Conn. 716, 737, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995). Accordingly, we conclude that, although the prosecutor's remark was improper, the comment's "natural and necessary impact upon the jury"; *State* v. *Satchwell*, supra, 244 Conn. 571; would not likely have been prejudicial, and there was, therefore, no violation of the defendant's rights under the fifth amendment.

The judgment is affirmed.

In this opinion the other justices concurred.