STATE OF CONNECTICUT *v.* YADEIL FIGUEROA
(AC 33035)

Beach, Alvord and Bishop, Js.

Argued January 23—officially released June 11, 2013

*Carlos E. Candal,* assigned counsel, for the appellant (defendant).

*Nancy L. Chupak,* senior assistant state's attorney, with whom, on the brief, were *Maureen Platt,* state's attorney, and *Cynthia S. Serafini,* senior assistant state's attorney, for the appellee (state).

BEACH, J. The question presented in this appeal is whether the defendant, Yadeil Figueroa, was deprived of his constitutional right to conflict free representation when his attorney's allegedly improper conduct became a significant issue in his trial.[1] Because the defendant has demonstrated an actual conflict of interest that adversely affected his counsel's performance; see *Mickens* v. *Taylor*, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); we reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this case. At about 1 a.m. on June 20, 2009, five armed individuals—four men and a woman—broke into 57 East Clay Street, a three-family house in Waterbury. The group forcibly entered the third-floor apartment, where two residents, Mario Agilar and Fredi Barrera, were home. Agilar and Barrera escaped from the apartment by jumping out a window and onto the roof of the second-floor porch. They then broke a window to enter their second-floor neighbors' apartment, from where they called 911. When the police arrived, Agilar and Barrera were on the roof, signaling to the third floor, where the perpetrators were ransacking their apartment.

The suspects scattered when the police arrived. While the officers fanned out in pursuit, the defendant, an unlicensed driver, approached 57 East Clay Street in an unregistered white Buick. Noticing the police cruisers on the scene, he pulled over and put his car in

---

[1] In addition to his sixth amendment claim, the defendant raises three other issues on appeal: that the trial court failed to appoint a guardian for the minor defendant to be present throughout the proceedings, as required by General Statutes § 54-199; that the court improperly permitted one of the state's witnesses to serve as an interpreter; and that the state engaged in prosecutorial impropriety. Because of our disposition of this appeal on sixth amendment grounds, we do not reach these claims.

reverse. Fifteen year old Tommy F.,[2] a friend of the defendant's, was in the front passenger seat. The police saw the female perpetrator, Tomasa LaPorte, fleeing the scene in the direction of the defendant's vehicle. As LaPorte approached the car, the police heard the defendant and Tommy yelling: "Vamos! Vamos!" She was apprehended as she was trying to get into the Buick.

Officer Jose Diaz of the Waterbury police department grasped the driver's side door to prevent the defendant's car from fleeing the scene. After a brief struggle, the defendant stopped the car and he and Tommy were arrested.

The defendant was charged with conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 and 53a-100aa (a) (2); aiding and abetting home invasion in violation of General Statutes §§ 53a-8 and 53a-100aa (a) (2); and the lesser included offenses of conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a), and aiding and abetting burglary in the first degree in violation of §§ 53a-8 and 53a-101 (a) (1) and (3).

During the defendant's trial, the parties introduced evidence as to what had transpired at a July 9, 2010 meeting at the Manson Youth Correctional Institution in Cheshire (Manson meeting), where the defendant and Tommy were incarcerated. The meeting had been arranged by the defendant's attorney, Tina D'Amato. Present at the meeting were the defendant, Tommy, D'Amato, an intern of D'Amato's, and an interpreter. Tommy recounted his version of what had happened on the night of June 20, 2009, and he provided a written statement to D'Amato. Tommy's attorney was not present.

---

[2] Because the witness was a minor, we refer to him as Tommy.

This meeting first came to light during the state's cross-examination of the defendant.[3] The defendant had testified on direct examination that he and Tommy had nothing to do with the home invasion. The prosecutor asked the defendant if, prior to the meeting, he had told Tommy that there were certain "things [that Tommy had] better say to [the defendant's] lawyer so that [the defendant] could get off . . . ." The prosecutor also asked the defendant: "And Miss D'Amato told Tommy that all he had to do was sign something and that would be the end of it, right?" She further inquired of the defendant if he had sat "right across from [Tommy] in this meeting," implying that the defendant had positioned himself close to Tommy in order to intimidate him. D'Amato objected to this line of questioning, asserting that the prosecutor "[had] no good faith basis" for intimating that D'Amato had played a role in facilitating a meeting that was designed improperly to secure favorable testimony from Tommy.

An on-the-record sidebar conference ensued. The court stated: "I'm going to be very cautious in allowing in evidence as to Miss D'Amato's role in this. I see no need for it, whatsoever. There's a risk when we start down that road that Miss D'Amato needs to become a witness, and I see no—and then we know what happens. So, I think it's a road that should not be traveled on. So, Miss Serafini [the prosecutor], unless this issue comes up in a way that—unless this issue comes up inadvertently, I see no need to go down it." The prosecutor responded that her position was that D'Amato had played a role "in the intimidation of [Tommy]." The court characterized this claim as "unnecessarily provocative . . . ." The court further asserted that, unless the state had evidence that D'Amato had committed misconduct, there should be no further questioning

---

[3] The defendant's and Tommy's first language is Spanish, and both required interpreters for their testimony.

about her role in allegedly inducing Tommy improperly to testify favorably for the defendant. The sidebar concluded with the court admonishing the state to "stay away from Miss D'Amato's role in this conversation unless circumstances change, unless it's raised by a witness inadvertently or some way that would go to the ultimate issue of what the defendant's conduct in this matter was." During the remainder of that day's cross-examination, the meeting was not raised by the state.

The Manson meeting came up again, however, when Tommy later testified for the defense. On direct examination, Tommy asserted that although he had pleaded guilty to charges stemming from the home invasion, he had not participated in the crimes. He also stated that he did not know any of the individuals charged in the home invasion, except for the defendant.[4] Tommy further testified that he and the defendant had just been out trying, unsuccessfully, to buy beer and were on their way back to the defendant's home when they were arrested.

On cross-examination, Tommy stated that he and the defendant had spoken with each other prior to the interview with D'Amato, and that the defendant had told Tommy that he did not want to serve time in prison. Tommy testified that he had been reluctant to speak with D'Amato, but that he felt obligated to meet with her. Tommy asserted that he felt "intimidated" during the meeting, as the defendant was sitting across from him. As to the veracity of his description of his and the defendant's activities on the night of the home invasion, Tommy denied that the defendant had instructed him what to tell D'Amato; but when the prosecutor asked

---

[4] Three of the four other individuals involved in the home invasion testified for the defense. They stated that they did not know either the defendant or Tommy and that they were not involved in the crime.

Tommy if D'Amato had "told [Tommy] she was going to help [him] out and try and help [him] get less time," Tommy said that this was true. Much of the remainder of the state's cross-examination emphasized the apparent contradiction between Tommy's guilty plea and his testimony that he had had no involvement in the home invasion and no relationships with the perpetrators.

The state on rebuttal called Orlando Rivera, a detective with the Waterbury police department. Rivera specifically testified regarding an interview with Tommy that had occurred on August 23, 2010, about one week before trial had commenced, at the Waterbury state's attorney's office. Present at the meeting were the prosecutor, Tommy, Tommy's attorney, and an investigator. Rivera served as an interpreter for Tommy.

Rivera testified with respect to what Tommy had told them about whether intimidation or improper promises influenced his description of his and the defendant's activities on the night of the home invasion. Rivera stated that Tommy told them that "parts of the statement [that Tommy gave D'Amato] were not accurate, they were not the truth." Rivera asserted that Tommy told the group that he had been instructed by the defendant to "simply say they were driving by [57 East Clay Street]," if he was ever asked about their involvement in the case. Tommy said that he complied, Rivera stated, because he was "[a]bsolutely" afraid of the defendant.

On cross-examination, in an apparent attempt to demonstrate that Tommy's statements at the Manson meeting were accurate, regardless of what D'Amato may have promised him, D'Amato asked Rivera: "[T]here's some allegation that I made a promise to [Tommy] about opening his case . . . . [D]id you ask him when that happened, before or after he signed the statement?" Rivera responded: "I believe [Tommy] said that it was before he gave a statement."

The state and the defendant made their final attempts to influence the jury's perception of the Manson meeting during closing arguments. D'Amato argued: "Tommy told you that he felt intimidated when I came to him with my intern. . . . But he also testified that he told you [the jury] the truth." The state suggested again that the whole point of the meeting was to coerce Tommy into providing a favorable, but untrue, statement about the defendant's role in the home invasion. The state asked rhetorically: "[The defendant] claims he never spoke in the meeting with [Tommy], the meeting that he had with [D'Amato]. So, what was his purpose at that meeting if he didn't say a word? Was it to scare and intimidate [Tommy] into saying that [the defendant] wasn't involved?"

The jury found the defendant guilty of conspiracy to commit home invasion and aiding and abetting home invasion. He was sentenced to a total of fifteen years imprisonment, execution suspended after ten years, and five years of probation. He now appeals.

The defendant claims that his sixth amendment right to conflict-free representation was violated as a result of the insinuations surrounding the Manson meeting. Specifically, his claim is that D'Amato labored under an actual conflict of interest, which adversely affected her performance. The defendant contends that D'Amato's alleged role in improperly securing favorable testimony placed her in an untenable position where her personal interests were in conflict with plausible alternative defense strategies and her participation in the Manson meeting diminished her credibility as an advocate at trial. The state counters that the defendant cannot show an adverse affect on his representation because D'Amato's and the defendant's interests never diverged; that is, both shared the objective of proving that Tommy's depiction of events was truthful and not the product of coercion or promises. Moreover, the

state argues that the defendant failed to articulate an alternative defense strategy that was not pursued because of the alleged conflict. We agree with the defendant.

This appeal presents a question of law over which we exercise plenary review. See *State* v. *Parrott*, 262 Conn. 276, 286, 811 A.2d 705 (2003). The sixth amendment's guarantee to criminal defendants of effective assistance of counsel encompasses "the right to be represented by an attorney who is free from conflicts of interest." *United States* v. *Blount*, 291 F.3d 201, 210 (2d Cir. 2002), cert. denied sub nom. *Streater* v. *United States*, 537 U.S. 1141, 123 S. Ct. 938, 154 L. Ed. 2d 838 (2003).

When a trial court becomes aware of the possibility of a conflict of interest, the court is obligated to inquire meaningfully into the conflict. See *State* v. *Lopez*, 80 Conn. App. 386, 391, 835 A.2d 126 (2003), aff'd, 271 Conn. 724, 859 A.2d 898 (2004). This obligation arises not only when there has been a timely conflict objection at trial, but also when "the trial court knows or reasonably should know that a particular conflict exists." Id.; cf. *Mickens* v. *Taylor*, supra, 535 U.S. 169 (trial court's duty to inquire not triggered when there is only "a vague, unspecified possibility of conflict"). The court's " 'inquiry must be thorough and searching' "; *State* v. *Lopez*, supra, 391; that is, "[t]he court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994).

The duty to inquire does not serve its own end but rather is premised, of course, on the need to avoid representation tainted by conflict. Conflicts of interest

most typically arise when an attorney represents multiple codefendants and the attorney's advocacy on behalf of one defendant is inconsistent with the interests of another or the attorney forbears pursuing a line of defense because it would compromise the defense of another. See *State* v. *Cruz*, 41 Conn. App. 809, 812, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996). Multiple representation is not, however, the only scenario implicating conflict of interest concerns. See *State* v. *Parrott*, supra, 262 Conn. 288. The possibility that a defendant's attorney could be a material witness in the case raises the possibility of divergent interests. See *State* v. *Lopez*, supra, 80 Conn. App. 393; *United States* v. *Levy*, supra, 25 F.3d 156 ("[defense attorney] had a personal interest to avoid even the possibility of being called as a witness, especially since he very likely would have had to cease representing [his client] if required to testify"). Additionally, courts have recognized an actual conflict of interest when a defendant's lawyer has engaged in conduct during the course of the representation that could result in criminal charges or significant disciplinary sanctions. See *United States* v. *Levy*, supra, 156 (cataloguing federal cases where allegations of defense counsel's impropriety result in actual conflict of interest). Moreover, even where disciplinary action may not be likely, an attorney's participation in dubious activity may diminish his or her effectiveness as an advocate. See *State* v. *Lopez*, supra, 394–95.

The mechanics appropriate to address issues of conflict of interest on appeal vary according to the record presented. Very often, where the facts regarding the conflict are not developed on the record, the remedy necessarily lies in habeas corpus. In *Lopez*, this court suggested that decisions of the trial court, rather than the actions of counsel, were appropriately reviewed on appeal. Id., 390. The court in *Lopez* also suggested, however, that direct claims of ineffective assistance

could be pursued on appeal where the record is adequate for their presentation. Id. Our Supreme Court in *State* v. *Parrott,* supra, 262 Conn. 285–86, held as well that direct review is appropriate where the record is adequate for review or where a question of law is presented.

In this case, the record is adequate for review of the claim that D'Amato's effectiveness was compromised by her participation in the meeting with Tommy and the suggestion, presented to the fact finder, that she may have attempted to offer consideration in return for favorable testimony. In such a circumstance, focus on the court's inquiry and the action of the court is beside the point. The court clearly was aware of the problem, did what little it could to minimize the impact, and otherwise allowed into evidence admissible testimony. No one requested a mistrial. In the circumstances of this case, the focus appropriately is on the effectiveness of counsel rather than the rulings of the court. The purpose of the court's inquiry, after all, is to determine whether there is an actual or potential conflict, and, if there is an actual conflict, to inquire whether the defendant chooses to waive the conflict or whether the attorney must withdraw. We are left in this case with a record of an actual conflict, no waiver and no withdrawal. "The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures." *Mickens* v. *Taylor,* supra, 535 U.S. 179 (Kennedy, J., concurring).[5]

---

[5] Indeed, the court in *Lopez* considered how the conflict of interest might have affected the defense attorney's trial strategy. See *State* v. *Lopez,* supra, 80 Conn. App. 394–96; id., 395 ("[i]t is impossible to determine what role defense counsel's involvement in securing the victim's recantation played in the making of strategic choices during trial"). The court discussed whether the conflict "may have weighed particularly with respect to [defense counsel's] decision not to testify" and whether it impacted his cross-examination of the victim. Id., 395–96. Considering the effect of the conflict on the representation was inevitable.

In *Mickens*, the United States Supreme Court held that if a case is to be reversed, the defendant must show that the conflict "adversely affected his counsel's performance." Id., 174. "[A] *potential* conflict of interest, no matter how it is addressed by the trial judge, is now insufficient [after *Mickens*] to warrant relief." (Emphasis in original.) *United States* v. *Fuller*, 312 F.3d 287, 291–92 (7th Cir. 2002). "This showing by a defendant of an actual conflict of interest is less burdensome than that required to establish ineffective assistance of counsel claims. . . . [T]he defendant must demonstrate that his counsel's performance was affected by the conflict, but need not also establish that the difference in performance prejudiced him in the same sense as in an ineffective assistance claim. . . . Showing an adverse effect, however, still requires more than mere speculation . . . the defendant must show that [the attorney] might plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, [the attorney's] other loyalties or interests . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *DeCologero*, 530 F.3d 36, 76–77 (1st Cir.), cert. denied, 555 U.S. 1005, 129 S. Ct. 513, 172 L. Ed. 2d 376 (2008); see also *Eisemann* v. *Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) ("[p]rejudice is presumed . . . if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance" [internal quotation marks omitted]). The United States Court of Appeals for the Second Circuit has explained that "a defendant need suggest only a 'plausible' alternative strategy that was not pursued at trial [because of a conflict of interest], not necessarily a 'reasonable' one." *Eisemann* v. *Herbert*, supra, 107. This is because "a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure." *United States* v. *Ellison*,

798 F.2d 1102, 1107 (7th Cir. 1986), cert. denied, 479 U.S. 1038, 107 S. Ct. 893, 93 L. Ed. 2d 845 (1987).[6]

What allegedly transpired at the Manson meeting created two areas of conflict. The first conflict lay in the tension between D'Amato's continuing representation and the need for her to testify. It was clear that one aspect of the state's theory of the case was that the meeting with Tommy was orchestrated to secure his favorable testimony by improper means. Consistent with this theory, the state adduced testimony that Tommy was intimidated by the defendant; that the defendant had spoken with Tommy in advance of the Manson meeting regarding what Tommy should tell D'Amato; that, at the meeting, the defendant sat directly across from Tommy, so he would not deviate from the prearranged script; and that D'Amato had promised Tommy some form of assistance with his own case. If the state's allegations are true, D'Amato experienced a serious lapse in professional judgment and, to one degree or another, facilitated witness intimidation.

Had she not represented the defendant at trial, D'Amato could have testified, but doing so may have been undesirable, from her perspective. See *United States* v. *Levy*, supra, 25 F.3d 156. Additionally, remaining in the case presented a situation where her self-interest may have militated against delving too deeply into the issue during Tommy's testimony. Cf. *State* v. *Lopez*, supra, 80 Conn. App. 395 ("[i]t is impossible to determine what role defense counsel's involvement in securing the victim's recantation played in the making of strategic choice during trial"); see also *United States* v. *Levy*, supra, 156.

---

[6] The appropriate standards to be applied in considering claims of actual conflict of interest are different from those applied in more generic claims of ineffective assistance of counsel. Compare, e.g., *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) with *Mickens* v. *Taylor*, supra, 535 U.S. 162.

The second conflict bearing on the sixth amendment right to effective counsel lay in her facilitation of the Manson meeting itself and in the way the meeting transpired, as her participation in the meeting could have led the jury to view defense counsel as the defendant's accomplice in securing Tommy's statement. See *State v. Lopez*, supra, 80 Conn. App. 395. This danger may have been exacerbated inadvertently when, during D'Amato's cross-examination of Detective Rivera, she asked not whether she had in fact promised Tommy assistance with his case, but whether that promise had come before or after Tommy had provided a favorable rendition of the events at issue. Although D'Amato may have been attempting to show that the substance of Tommy's statement was truthful, she reinforced the state's depiction of the meeting as unsavory.

The state argues that the defendant cannot show that D'Amato's conflict of interest had an adverse effect on the representation because there were other witnesses, namely, D'Amato's intern and the interpreter, who could have testified as to what occurred at the Manson meeting. Neither of these individuals, however, would have been a substitute for D'Amato, who was the only person who could have explained any statements that she made to Tommy about assisting him with his case, *and* why she believed it was necessary—and appropriate—for the defendant to attend the meeting. We need not find that D'Amato's testimony would have proved a successful trial strategy; "[w]ith respect to the substance of the plausible alternative strategy, the defendant . . . only [must show] that it possessed sufficient substance to be a viable alternative." (Internal quotation marks omitted.) *Eisemann* v. *Herbert*, supra, 401 F.3d 107. The defendant has made the requisite showing of an actual conflict affecting performance.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.