******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSUE RIVERA
(AC 36979)

Beach, Prescott and Bishop, Js.

*Argued September 8—officially released November 15, 2016*

(Appeal from Superior Court, judicial district of New Haven, B. Fischer, J.)

*Susan M. Hankins*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom were *Brian K. Sibley, Sr.*, senior assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, and *Adrienne Maciulewski*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Josue Rivera, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and tampering with physical evidence in violation of General Statutes § 53a-155 (a). On appeal, the defendant claims that (1) the prosecutor violated his constitutional and statutory right to remain silent, and his constitutional due process right to a fair trial as the result of improper comments made during closing arguments, (2) the trial court improperly permitted a police officer to testify as an expert witness about body language and other indicators of untruthfulness, (3) the trial court abused its discretion by admitting into evidence postmortem photographs of the victim, and (4) the trial court violated the defendant's statutory right to present a defense by excluding evidence relevant to the defendant's theory of self-defense.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Sometime in April or May, 2012, the victim, Anthony Pesapane, began living with the defendant and the defendant's family in a first floor unit of a multifamily house in New Haven, an arrangement designed to help the defendant pay rent. The victim regularly attended a local clinic to receive daily methadone treatments, and would often drive the defendant and his wife, Marta Matejkowska, to the clinic for their treatments as well. The last time the victim ever attended the clinic, however, was on June 4, 2012.

Later that day, while in the victim's bedroom, the defendant fatally stabbed the victim twenty-one times. One wound was 3.5 inches deep in the victim's chest and punctured his heart. After the victim died, the defendant cleaned the room with bleach, discarded the knife into the Quinnipiac River, and rolled the victim's body up into a rug. The defendant then obtained a U-Haul truck and placed the body and other bloodstained items in the rear compartment of the truck.

On June 11, 2012, the police conducted a motor vehicle stop of the U-Haul in Woodbridge, and found Matejkowska in the driver seat and the defendant in the passenger seat. The police then opened the back of the truck, where they found the victim's body. After the body was discovered, the defendant gave two statements to the police, one written and one videotaped.[2]

On February 20, 2014, in a long form information, the defendant was charged with murder in violation of § 53a-54a (a) and tampering with physical evidence in violation of § 53a-155 (a). During his jury trial, the defendant claimed he acted in self-defense, but he did not testify. Ultimately, the defendant was acquitted of murder but convicted of the lesser included offense of manslaughter in the first degree in violation of § 53a-55

(a) (1) and of tampering with physical evidence. The defendant received a total effective sentence of twenty-three years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

PROSECUTORIAL IMPROPRIETY

The defendant first claims that the prosecutor deprived him of his constitutional and statutory right to remain silent as well as his due process right to a fair trial by committing various acts of impropriety during closing argument to the jury. In particular, the defendant argues that the prosecutor improperly (1) commented on the defendant's failure to testify, (2) shifted and misstated the burden of proof with respect to self-defense, and (3) argued facts not in evidence. The state argues that the prosecutor's comments were not improper. Alternatively, the state contends that even if one or more of the prosecutor's comments were improper, none of them deprived the defendant of a fair trial. We disagree with the defendant that the prosecutor's comments were improper.

Before addressing the merits of the defendant's claim, we set forth the applicable standard of review and the law governing prosecutorial impropriety. Although the defendant did not preserve his claim of prosecutorial impropriety by objecting to the alleged improprieties at trial, "[o]nce prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*." (Footnote omitted.) *State* v. *Fauci*, 282 Conn. 23, 33, 917 A.2d 978 (2007). "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial."[3] (Citations omitted.) Id., 32.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t

does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 37, 100 A.3d 779 (2014).

A

Alleged Comment on Defendant's Failure to Testify

We turn first to the defendant's argument that the prosecutor improperly commented during closing argument on the defendant's failure to testify, thereby violating the defendant's fifth amendment rights[4] and General Statutes § 54-84 (a).[5] In response, the state argues that the prosecutor's remarks referred to the two statements that the defendant made to police and that were admitted at trial, not to his failure to give in-court witness testimony. We conclude that the comments in question were not of such a character that the jury naturally and necessarily would construe them to be comments on the defendant's election not to testify.

During closing argument, the prosecutor directed the jury's attention to what he argued were the material pieces of evidence that the jury should consider when determining the defendant's guilt. The prosecutor stated: "What are some things you should look at? The two statements are probably the two most important things that give light to what happened here. In this courtroom there is one person [who] can tell you exactly what happened, to be truthful, and sit and ask questions, and that's [the defendant]. The only other person that we know is [the victim] and, unfortunately, he's not here, or we wouldn't be here. So, who has something to lose when they start telling the story about why they got caught with a body in the back of a truck? You have to come up with some explanation when the police are banging on that door, saying, tell me what's going on back here."

Shortly thereafter, the prosecutor again returned to the subject of the defendant's statements to the police, imploring the jury to "[t]ake a look at the statements; those are the two closest things that we're going to get to in terms of what happened. The physical evidence speaks for itself. Does it line up with what we know? And what do we know? We know the story one person told. And the judge talks to you about credibility in terms of what you use to determine. Does somebody have a stake in what they're telling the police? Does somebody have a stake when they sit in that chair and testify for you? Who has the most to lose here? So, what does he say? Does his story in the statements make sense? When you're trying to recall a story about what actually happened, most of the time, you're going to get the facts straight because that's the truth you're testifying—you're recalling an event based on memory. But when you start trying to deceive somebody, those little details start falling away from what actually hap-

pened." The defendant did not object to these comments.

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. . . . Our legislature has given statutory recognition to this right by virtue of its enactment of . . . § 54-84. In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 292–93, 811 A.2d 705 (2003).

"When reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial. . . . [W]hen a prosecutor's potentially improper remarks are ambiguous, a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Citation omitted; internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015).

Here, the defendant argues that the prosecutor's remarks were explicitly directed toward the defendant's failure to testify because the plain language, "that's [the defendant]," "[i]n this courtroom," and "sit in that chair," leaves no room for any other possible interpretation. He asserts that the improper remarks attempted to inextricably link the defendant's credibility and viability of his self-defense claim to his failure to take the witness stand, as most clearly illustrated by his comment that the defendant was the "one person" who "can tell [the jury] exactly what happened" because "[t]he only other person" was the victim. The state argues that, if the comments are viewed in their full context, the prosecutor was stating to the jury that it needed to assess carefully the credibility of the two statements that the defendant provided to police because the only two people who had firsthand knowledge of what occurred on the day the victim was killed were the defendant and the victim.

In this case, we conclude that although, in isolation,

the statements relied on by the defendant could be construed as referring to the defendant's decision not to testify, if the statements are put into the context of the entire trial and closing argument, the prosecutor's remarks refer to the evidence of the defendant's two statements to the police. Two of the challenged statements made by the prosecutor—"[i]n this courtroom there is one person [who] can tell you exactly what happened, to be truthful, and sit and ask questions, and that's [the defendant], and "[t]he only other person that we know is [the victim] and, unfortunately, he's not here, or we wouldn't be here"—are immediately preceded and followed by language referring to the defendant's out-of-court statements, i.e., his statements to the police. Moreover, "[i]n this courtroom" arguably describes the current location of the "one person," that is, the defendant, who is able to "tell [the jury]," that is, via his statements to the police, which were admitted at trial, what had happened on the day of the victim's death. To parse the sentence even further by examining what the prosecutor intended when he said, "*can* tell you exactly what happened," instead of, more accurately, "*did* tell you exactly what happened," would be to scrutinize each of the prosecutor's individual words in a vacuum, precisely what this court should not do. (Emphasis added.) See *State* v. *Felix R.*, supra, 319 Conn. 9. We necessarily allow the prosecutor generous latitude in closing argument, lest every inaccurate verb tense be deemed impropriety.

The challenged comment that is most equivocal in its meaning is the prosecutor's question, "Does somebody have a stake when they sit in that chair and testify for you?" It is unclear whether the prosecutor was referring to the stake that any witness has when he or she sits in the witness chair and testifies at trial, the stake that the defendant specifically has when he sits in the witness chair and testifies at trial, or the stake that the defendant specifically has when he sits in a chair at the police station and gives his version of events, as presented to the jurors at trial. We conclude that this segment of the closing argument was, at worst, sufficiently ambiguous that it clearly was not "manifestly intended to be, [nor] was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify . . . ." (Internal quotation marks omitted.) *State* v. *Parrott*, supra, 262 Conn. 293. Because "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning"; *State* v. *Felix R.*, supra, 319 Conn. 9; we decline to accept the defendant's interpretation of the prosecutor's comments. Accordingly, we conclude that the challenged statements do not constitute improper comments by the prosecutor on the defendant's failure to testify.[6]

B

Alleged Misstatement of Burden of Proof

The defendant next contends that the prosecutor misled the jury by misstating the burden of proof regarding self-defense. More specifically, the defendant argues that the prosecutor improperly used the language "probable" and "possible" instead of "beyond a reasonable doubt." The state responds by arguing that the prosecutor's language was not improper because it was made in reference to a subsidiary finding by the jury, not a finding on one or more elements of self-defense. We agree with the state.

During the state's direct examination of James R. Gill, the state's chief medical examiner, the prosecutor asked if the victim's wounds were consistent with the victim having been lying down at the time he was stabbed, to which Gill replied: "Certainly, if he's [lying] down prone . . . on his back, it would be a matter of having that surface of the body where the stab wound was to be able to be reachable or exposed to the knife." Subsequently, during cross-examination, the defendant's counsel engaged Gill in the following exchange:

"Q. Dr. Gill, from your examination of the body of [the victim], who started the fight?

"A. I have no idea if there even was a fight. . . .

"Q. And you don't know where [the victim] was standing in relation to the person who stabbed him, correct?

"A. Yeah, I don't know if he was standing, sitting, lying down; that's correct.

"Q. Actually, it could be—as long as the—the arm could reach to the spot where the stab wound went in, it could be in any position, correct?

"A. It could be from behind, reaching around, yeah, a variety of positions, yeah."

After this line of questioning, the defendant and his counsel performed demonstrations in the courtroom in which they modeled several positions that the defendant and the victim may have been in when the altercation began and the victim sustained various injuries. The defendant's counsel then followed up the presentations by asking Gill if each demonstration was consistent with the wounds of the victim as contained in the autopsy findings.[7] Subsequently, during closing argument, the prosecutor referenced these enactments and stated: "You saw the defendant and his attorney provide demonstrations here in the courtroom; seemed pretty creative. Is it *possible*? Yes, it's *possible*. But what is more *probable* in light of the injuries?" (Emphasis added.)

We turn then to the authorities relevant to this claim. The defense of self-defense is codified in General Statutes § 53a-19, which provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this

section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.”

“Under our Penal Code, self-defense . . . is a defense . . . rather than an affirmative defense. . . . Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state’s burden to disprove the defense beyond a reasonable doubt. . . . The state may defeat a defendant’s claim of self-defense involving deadly physical force by proving, beyond a reasonable doubt, any of the following: (1) the defendant did not reasonably believe that the victim was using or about to use deadly physical force or inflicting or about to inflict great bodily harm; or (2) the defendant knew that he could avoid the necessity of using deadly physical force with complete safety by retreating . . . .” (Citations omitted; internal quotation marks omitted.) *State* v. *Singleton*, 292 Conn. 734, 747, 974 A.2d 679 (2009).

Although, in a criminal prosecution, a material fact must be proven beyond a reasonable doubt, “[t]his does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury’s factual inferences that support a guilty verdict need only be reasonable. . . . [I]t is a function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence.” (Citation omitted; internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 518, 782 A.2d 658 (2001).

Here, the defendant argues that the prosecutor’s use of the language “probable” and “possible” misled the jury by suggesting a probability standard for self-defense rather than the state’s burden of disproof beyond a reasonable doubt. We do not agree.

The prosecutor’s remark—“Yes, it’s possible. But what is more probable”—explicitly refers to the court-

room demonstrations that the defendant and his counsel engaged in during the trial. Those demonstrations attempted to show the different positions that the victim may have been in in relation to the defendant at the time the altercation began and escalated, in an effort to cast doubt on the state's theory that the victim was lying down when the dispute started. The only two elements of self-defense that the state must disprove "beyond a reasonable doubt" are (1) that the defendant reasonably believed that the victim was using or about to use deadly physical force or inflicting or about to inflict great bodily harm, and (2) that the defendant did not know that he could avoid the necessity of using deadly physical force with complete safety by retreating. Therefore, although evidence offered to prove how the victim was positioned when the dispute began is certainly useful information for the jury to consider, it is not an element of self-defense pursuant to § 53a-19. Accordingly, as a subordinate conclusion of the jury, the conclusion need only be reasonable, but cannot be based on " 'possibilities, surmise or conjecture.' " *State* v. *Niemeyer*, supra, 258 Conn. 518.

Because the prosecutor characterized the defendant's demonstrations to the jury as providing only a *possible* version of the events in question, he referenced the proper "reasonable" versus merely "possible" standard assigned to subsidiary findings. We conclude, therefore, that the prosecutor did not commit impropriety by using the "possible" versus "probable" language during closing argument.

Relatedly, the defendant also claims in this section of his brief that the prosecutor improperly communicated to the jury during closing argument the state's theory that the defendant initially stabbed the victim while the victim was sleeping. More specifically, the defendant argues that this theory was unsupported by the evidence. The state responds that this theory constituted a reasonable inference drawn from both the testimony of Gill and the physical evidence of the victim's injuries.

"[T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. . . . But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Niemeyer*, supra, 258 Conn. 518.

As previously discussed, Gill testified during direct examination that the victim's wounds were consistent with having been in a prone position at the time he was stabbed. On redirect, the state again followed up on this theory, asking Gill "if a person was prone, face down, and a right-handed person approached the person that's prone up toward the head area, and the person would be lower, wouldn't that also be consistent with the type of wounds that were received on the— the left side of the neck and shoulder," and whether "[i]t would be easier for a shorter person to reach a taller person at that—at that level," to both of which Gill answered in the affirmative. Given this testimony and the one-sided nature of the victim's injuries, and especially in light of the generous latitude we afford prosecutors during closing arguments, it was reasonable for the prosecutor to ask the jury to infer that the victim was first attacked when he was asleep. We conclude that this did not constitute impropriety.

C

Alleged Interjection of Facts not in Evidence

Finally, the defendant contends that the prosecutor committed an impropriety during closing argument when he interjected facts that were not in evidence. Specifically, the defendant argues that the prosecutor improperly brought in "facts" that were based on assumptions about professional fighters in general, drug addicts in general, and the defendant and the victim in particular. The state responds that these comments constituted an appropriate use of a rhetorical device designed to appeal to the jury's common sense. We agree with the state.

In his rebuttal argument, the prosecutor, in an effort to cast doubt on the defendant's self-defense claim and, more specifically, on the statements that the defendant made to the police regarding the nature and length of the struggle he had with the victim, stated the following: "Professional fighters don't even fight all out for an hour, and they're trained. It's not like either one of these people was trained in anything; drug addicts, they don't eat right, they're using drugs. Are they going to be physically capable of fighting all out for an hour? That's— that's for you to decide. But it's really, kind of, making a huge stretch."

Our law is well settled that "[the prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. . . . That is not to say, however, that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . The state's attor-

ney should not be put in [a] rhetorical straitjacket . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 435, 64 A.3d 91 (2013). Moreover, "jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 790–91, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

In the present case, the defendant argues that the prosecutor's remark was improper because no evidence was presented at trial about the abilities of professional fighters or the physical abilities, stamina, and nutrition of drug addicts.[8] We are not convinced that there needed to be. The use of juxtaposition, wherein one places a person, concept, or idea parallel to another to highlight the contrast between the two and compare them, as a rhetorical device to make a point in closing argument, is not prohibited. In this case, the prosecutor used the device in appealing to the jury's common sense that, because even professional fighters lack the stamina to fight continuously for an hour, the defendant's version of events simply was incredible. We agree with the state that the prosecutor "naturally presented [his argument] to the jury with the warmth and color of advocacy." *State* v. *Chapman*, 103 Conn. 453, 476, 130 A. 899 (1925). To hold otherwise would be to put the prosecutor in the prohibited "rhetorical straitjacket," which we decline to do.

In sum, we conclude that none of the challenged comments by the prosecutor was improper. Accordingly, the defendant was not deprived of his right to a fair trial.

## II

### ADMISSION OF EXPERT TESTIMONY BY DETECTIVE WUCHEK

We next turn to the defendant's claim that "[t]he trial court erred in permitting [Michael Wuchek, a detective with the New Haven Police Department] to testify as an expert witness to body language and other indicators of untruthfulness during police interviews, thereby invading the credibility determinations and fact-finding province of the jury." In response, the state argues that (1) the defendant's claim is unpreserved, (2) the trial court did not abuse its discretion in permitting this testimony because Wuchek did not opine on the defendant's credibility, and (3) the defendant's failure to object to other similar evidence rendered Wuchek's testimony cumulative, thus rendering any error in permitting his testimony harmless. We conclude that to the

extent the defendant claims on appeal that Wuchek's testimony is not a proper topic for expert testimony because it is inherently unreliable, this claim was not properly preserved at trial, and to the extent that the defendant claims that the testimony invaded the jury's exclusive function as trier of fact to assess the defendant's credibility, the trial court's ruling was not an abuse of discretion.

During its case-in-chief, the state presented the testimony of Joseph Pettola, a detective with the New Haven Police Department. Pettola, who participated in the videotaped interview of the defendant along with Wuchek, described the defendant's demeanor during that meeting as "kind of on the nervous side." He further testified, without objection, that the defendant "wouldn't look Detective Wuchek in our eye—in the eye, in our eyes, which is an indicator of, you know, if you're telling the truth or not, and doing many, many—hundreds of interviews in my career." The prosecutor then engaged in the following exchange with Pettola:

"Q. All right. Were you also sort of paying attention to things like body language and things of that nature as [the defendant's] answering questions?

"A. Of course.

"Q. All right. What are you looking for when you're doing interviews and you're in that role, you're just observing somebody? What are some of the cues that you're looking for, sir?

"A. About—like I said before about looking you in the eye and not keeping your head down and looking up forward. . . .

"Q. All right. So, now, you—what—you said—you were looking for what, sir?

"A. Like, if the person you're interviewing [is] actually looking, you know, one-on-one, looking—look you right in the eye and wouldn't keep their head down or being fidgety, you know, all the time saying something and moving—moving certain body parts, as being very nervous or irritable when they're—when they're giving their version of what happened."

The state later presented the testimony of Wuchek, during which the defendant's videotaped statement was admitted into evidence. After the videotape concluded, the state asked Wuchek if he "[pays] any particular attention to such things like body language" during his police interviews, to which Wuchek answered in the affirmative. When the state asked him to elaborate on why he does that, the defendant objected on the ground of relevance, without further elucidation, which the trial court overruled. Wuchek then replied that "[b]ody language helps [him] gauge the truthfulness of people's answers," to which the defendant again objected, stating: "The jury has seen a videotape of the entire inter-

view. The witness' interpretation of my client's credibility is—is taking on the jury's job." The trial court disagreed and again overruled the objection. Wuchek continued: "Through interview and interrogation courses, we've learned that—I learned that people who are interviewed, sometimes, when they are untruthful they'll cover their mouth, they'll—they'll hunch down. Other indicators just help us get a feel for that person." The prosecutor went on to ask for other indicators of untruthfulness, to which Wuchek cited various behaviors such as repeating interview questions, taking long pauses, and looking down or away from the interviewer.

In a final exchange relevant to this claim, the prosecutor asked Wuchek if, during the course of his interview with the defendant, he had at his disposal bank records, phone records, evidence from the U-Haul scene, and/ or evidence from the rental unit scene. Wuchek stated, "No, I don't think so." The following colloquy then took place between the prosecutor, Wuchek, the defendant's counsel, and the trial court:

"[The Prosecutor]: All right. So, how does . . . a lack of information such as being able to do those things affect your interview in this case?

"[The Witness]: Well, I want to have as many facts as I—as I can to the case, both background and facts of the physical evidence so that I can gauge that person— gauge that person's truthfulness. A lot of times that's why I'll repeat the—

"[The Defendant's Counsel]: Objection, Your Honor. He's testifying as to evaluating a person's truthfulness. This is the sole province of the jury.

"The Court: No, it's an interview technique that he is discussing that he's been trained for, so I'm going to allow it.

"[The Defendant's Counsel]: Well, I—I didn't hear a foundation of how—what training and experience— well, the training that he's received in determining people's truthfulness. I didn't hear anything about his courses at the police academy or anything that he did in order to prepare himself to determine somebody's truthfulness.

"The Court: All right. Do you want to get into more of a foundation on that?

"[The Prosecutor]: Judge, I believe the officer's testified he's conducted over thousands of interviews, and he just testified that through courses in interrogations and interviews, he's had training.

"The Court: All right. I will allow it. Go ahead."

As a threshold matter, we first address the state's initial argument that the defendant's evidentiary claim was not preserved at trial and, thus, is unreviewable by this court on appeal. "[T]he standard for the preser-

vation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013).

Although the defendant's brief on appeal is somewhat unclear regarding the precise ground upon which he challenges Wuchek's testimony, a careful reading of the defendant's appellate brief, as well as remarks made at oral argument, lead us to conclude that he primarily argues that physical indicators of a person's untruthfulness is not an appropriate topic for expert testimony because it is inherently unreliable.[9] As support for this argument, the defendant asserts that "[n]umerous studies refute the police human lie detector theory," and cites to a lengthy footnote in the majority opinion of *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 332 n.83, 112 A.3d 1 (2015), in which our Supreme Court noted that "at the petitioner's first habeas trial, Richard Leo, a leading authority on police interrogation methods and false confessions, testified that the commonly held belief among police officers that deception can be determined merely by observing someone's body language is totally pseudoscientific . . . . [I]f somebody is slumped over, if somebody is passive, if somebody utters quiet denials, if somebody is in a runner's position, somebody is sweating, evasive or nervous, that is not necessarily indicative of guilt . . . ." (Internal quotation marks omitted.) Our Supreme Court in *Lapointe* continued: "We acknowledge Leo's testimony . . . to point out that any testimony by [the police interrogation witness] at a new trial concerning the petitioner's purportedly incriminating body language may well be subject to substantial impeachment, thereby minimizing or even eliminating whatever adverse effect that testimony might have had on the petitioner at his criminal trial."[10] Id., 333 n.83.

With regard to expert testimony in general, "the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks

omitted.) *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 342, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007). "In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 230, 49 A.3d 705 (2012).

We agree with the defendant that a significant question exists regarding whether the type of testimony in the present case is inherently reliable and, thus, "helpful to the . . . jury in considering the issues." (Internal quotation marks omitted.) *Prentice* v. *Dalco Electric, Inc.*, supra, 280 Conn. 342. As previously mentioned, our Supreme Court recently suggested in a lengthy footnote in *Lapointe* that, at a minimum, this method of behavior analysis by police would be subject to substantial impeachment, without necessarily opining on its admissibility. We need not decide this issue in the present case, however, because the three objections made by the defendant in response to Wuchek's testimony did not apprise the trial court that the basis of the objection was a challenge to the reliability of this type of testimony. Instead, the objections included a generic reference to its relevance,[11] a claim that the testimony invaded the exclusive province of the jury to assess the defendant's credibility, and a claim that there was a lack of foundation for the expert opinion.[12] The objections raised to the trial court contained no reference to any studies that would suggest that this type of testimony is inherently unreliable. Moreover, the defendant never asked for a *Porter*[13] hearing on the reliability of the expert testimony, or argued that although the expert testimony is nonscientific in nature and thus not subject to *Porter* review, the court should still exclude it as inherently unreliable as an exercise of its gatekeeping function. See *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ("[w]e conclude that [the] general holding [of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). Finally, in light of the fact that the defendant failed to object in any way to the similar testimony given by Pettola, we are further convinced that the defendant did not make the same objec-

tion at trial that he now advances on appeal. As "the sine qua non of preservation is fair notice to the trial court"; (internal quotation marks omitted) *State* v. *Dixon*, 318 Conn. 495, 500, 122 A.3d 542 (2015); we conclude that this claim was not preserved and, thus, is unreviewable by this court on appeal.

To the extent that the defendant challenges on appeal Wuchek's testimony on the ground that it invaded the jury's exclusive function as trier of fact to assess the defendant's credibility, we conclude that this claim was properly preserved at trial.[14] At the same time, however, because "[t]he trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done"; (internal quotation marks omitted) *State* v. *Polynice*, 164 Conn. App. 390, 405, 133 A.3d 952, cert. denied, 321 Conn. 914, 136 A.3d 1274 (2016); we conclude that the trial court did not abuse its discretion in allowing Wuchek's testimony on this ground.

"[I]t is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude." *State* v. *Johnson*, 288 Conn. 236, 265, 951 A.2d 1257 (2008). "Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005). Moreover, our Supreme Court held in *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012), that an expert should not be permitted to testify as to whether a particular complainant exhibited specific behaviors that the expert also identified as those characteristic of sexual assault victims because (1) such testimony amounts to an implicit opinion on whether the complainant's claims are truthful, and (2) the subject of such testimony is not beyond the knowledge of an average juror.

We previously have emphasized, however, that "a critical distinction must be recognized between admissible expert testimony limited to general or typical behavior patterns and inadmissible testimony directly related to a particular witness' credibility." *State* v. *Leniart*, 166 Conn. App. 142, 223, 140 A.3d 1026, cert. granted on other grounds, 323 Conn. 918,      A.3d (2016), citing *State* v. *Spigarolo*, 210 Conn. 359, 378–79, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Thus, in *Leniart*, we held that the trial court abused its discretion by excluding expert testimony that was "narrowly tailored to provide only general information related to [jailhouse] informant testimony and its unreliability"; *State* v. *Leniart*, supra, 224; because the expert "offered no testimony regarding any of the particular informants in this case, either with respect to their status as informants, how they had obtained their information, or their potential reliability

as witnesses." Id., 223.

Similarly, in the present case, the trial court record reveals that Wuchek was never asked for, nor did he offer, his opinion as to either the credibility of this particular defendant, the truthfulness of this particular defendant's statements, or whether the defendant exhibited any behaviors characteristic of untruthful behavior. Although Wuchek did testify generally as to various behaviors concerning eye contact, posture, and speaking patterns that, on the basis of his training and experience, he opined are characteristic of people who are being untruthful, Wuchek, unlike the expert in *Favoccia*, did not directly comment on whether this particular witness exhibited any of those discussed behaviors. The jury remained free to assess independently, untainted by expert testimony, whether the defendant actually engaged in such behaviors.[15] Accordingly, we conclude that the trial court did not abuse its discretion by overruling the defendant's objection to Wuchek's testimony on the ground that it invaded the province of the jury.

In sum, we conclude that to the extent the defendant is now claiming that body language and other behavioral indicators of untruthfulness are not proper subjects for expert testimony because they are inherently unreliable, this claim was not properly preserved at trial. To the extent that the defendant is claiming that Wuchek's testimony invaded the jury's exclusive function as trier of fact to assess the defendant's credibility, we conclude that the trial court did not abuse its discretion in making this evidentiary ruling.

III

ADMISSION OF POSTMORTEM
PHOTOGRAPHS OF VICTIM

We next turn to the defendant's claim that the trial court improperly admitted postmortem photographs of the victim's corpse in advanced decomposition. The defendant argues that the limited evidentiary value of the photographs was outweighed by their prejudicial effect because the photographs improperly inflamed the emotions of the jury. In response, the state argues that the defendant has failed to establish that the trial court abused its discretion in admitting the subject photographs. We agree with the state.

During the state's case-in-chief, Matthew Greenstein, a state police trooper responsible for collecting evidence at the scene where the victim's body was found, identified five photographs that depicted various items as they appeared in the back of the U-Haul truck. The defendant objected to the admission of one of the photographs that depicted the victim's body partially rolled in the rug amid other items in the back of the truck, and the trial court excused the jurors. The defendant conceded that the photograph was relevant, but argued

that its probative value was outweighed by its prejudicial effect because it portrayed a decaying head that would be shocking to the jury. Moreover, he contended that the state had already established that there was a body found in the back of the U-Haul and that the body was that of the victim. The state argued that the photograph was relevant to the case, as the manner in which the victim's body was discovered was relevant both to the charge of tampering with physical evidence as well as to the defendant's state of mind.

The trial court examined the photograph and overruled the defendant's objection, noting that the photograph was part of the history of the case and relevant to both counts, and that it was not inflammatory because it merely depicted the left arm of a person, presumably the victim, with the top of the body being "dark; this court cannot even make out what that entails." Ultimately, the trial court concluded that the photograph was "not so prejudicial that it cannot be seen [by] the jury."

The defendant next objected to autopsy photographs of the victim that the state sought to admit during its direct examination of Gill, the chief medical examiner. After the jury was excused from the courtroom, the defendant again asserted that the probative value of the photographs was very small compared to the prejudicial effect they would have on the jury, as the photographs contained shocking depictions of "a body that's been decaying and skin has slipped off and the skin is discolored."[16] He also argued that although the photographs may better show the jury the specific locations of stab wounds on the victim's body, the same information was already presented to the jury through other means, specifically, the medical examiner's report, a diagram with markings representing the locations of the stab wounds on the body, and the testimony of Gill. In contrast, the state argued that it had selected the fewest number of photographs from the autopsy that it believed would sufficiently convey the full examination, and that the photographs were necessary to aid the jurors in "[listen]ing to the testimony of [Gill], putting together the written version along with a visual aspect in order for them to gasp the totality of what the examination included."

The trial court, which had previously examined the photographs in chambers, overruled the defendant's objection, citing the state's heavy burden to prove every element of the two count information beyond a reasonable doubt, and the defendant's self-defense theory of the case on which the jury was to be instructed in the future. More specifically, the trial court stated that "it's very relevant for this jury to see . . . the number of stab wounds, the location of the stab wounds because that gets into the subjective, objective thoughts of the defendant and his claim of self-defense. So, that's rele-

vant. . . . I understand that the photos are not the easiest to see. The record will reflect that I have seen the photos in chambers. So, I am going to allow them in. I find that they would be an aid to this jury and they are relevant evidence, so I will allow them in." Accordingly, the trial court engaged in a weighing of the probative value of these photographs against their prejudicial effect.

As previously mentioned, our standard of review for evidentiary rulings is well established. "The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *Bunting* v. *Bunting*, 60 Conn. App. 665, 670, 760 A.2d 989 (2000). "[S]ound discretion has long meant a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." (Internal quotation marks omitted.) *State* v. *Williams*, 195 Conn. 1, 8, 485 A.2d 570 (1985). Furthermore, "[e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001).

Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." "A potentially inflammatory photograph may be admitted if the court, in its discretion, determines that the probative value of the photograph outweighs the prejudicial effect it might have on the jury." *State* v. *Williams*, 227 Conn. 101, 111, 629 A.2d 402 (1993). "The principles governing the admission of potentially inflammatory photographic evidence are clear. . . . [W]e adhere to the general rule that photographs which have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry are not rendered inadmissible simply because they may be characterized as gruesome. . . . When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial court's determination as to whether their value as evidence outweighs their possible prejudicial effect. . . . Since the trial court exercises its broad discretion in such circumstances, its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown."

(Internal quotation marks omitted.) *State* v. *Walker*, 206 Conn. 300, 314–15, 537 A.2d 1021 (1988).

In the present case, the comprehensive trial court record reveals that we need not engage in a lengthy analysis of the court's ruling. As previously recounted, the trial court heard a lengthy offer of proof and arguments from the parties before balancing the probative value of the photographs against the risk of unfair prejudice. With respect to the photograph showing what appeared to be the victim's body in a rug in the back of the U-Haul truck, the trial court had difficulty even finding anything inflammatory about the image because it was difficult for the viewer to make out any details concerning the appearance of the victim's body. With respect to the autopsy examination photographs, we have previously held that "[a]utopsy photographs depicting the wounds of victims are independently relevant because they may show the character, location and course of the [weapon]," and that it is not an abuse of discretion to admit them when they are presented "to prove intent and causation, to help explain the autopsy procedure, [and] to assist the medical examiner in describing his observations . . . ." *State* v. *Howard*, 88 Conn. App. 404, 428, 870 A.2d 8, cert. denied, 275 Conn. 917, 883 A.2d 1250 (2005). On the basis of our review of the record, including the photographs in question, therefore, we conclude that the trial court did not abuse its discretion by admitting the photographs into evidence.

## IV

### EXCLUSION OF PROFFERED SELF-DEFENSE EVIDENCE

The defendant finally claims that the trial court improperly excluded evidence relevant to his state of mind and self-defense claim, thereby violating his right to present a defense. Specifically, the defendant argues that the trial court should have allowed the jury to hear evidence of his prior experience as a witness to a fatal knife fight many years earlier because it was relevant to support his subjective belief that he needed to use deadly physical force against the victim pursuant to § 53a-19. In response, the state argues that the trial court acted well within its discretion in concluding that the proffered evidence lacked a sufficient nexus to the defendant's altercation with the victim in this case. We agree with the state that the trial court did not abuse its discretion in excluding the evidence.

During his case-in-chief, the defendant, as support for his self-defense claim, sought to admit evidence of a fatal knife fight that he had witnessed fourteen years earlier. Outside the presence of the jury, the defendant offered the testimony of private investigator Deborah Curtis, who did not witness the altercation but had investigated the fatal stabbing back in 2000. Curtis testi-

fied that the defendant, who was fourteen years old at the time of the incident, was at home with his mother and stepfather when his mother's former boyfriend arrived at the home with a knife and began fighting with his stepfather. After a struggle in which his stepfather was repeatedly stabbed, his stepfather ultimately wrestled the knife away and fatally stabbed the former boyfriend.

Before the defendant could finish his questioning of Curtis, however, both the state and the trial court interjected. The state proceeded to object to the admission of the evidence on relevance grounds, citing its remoteness in time from the events of the present case, and the lack of correlation between the proffered evidence and the alleged events of the present case. In response, the defendant argued that "the fact that he witnessed two of his stepfathers in a knife fight and one of them died is a subjective aspect of this—of his psyche and what he was anticipating the threat to be when [the victim] came at him with a knife." The defendant also informed the trial court that he intended to call to the witness stand Sergio Estrada, the defendant's stepfather and one of the two individuals involved in the knife fight in 2000, as part of his offer of proof. Specifically, the defendant's counsel stated that he intended "to have [the defendant's] stepfather, who survived, testify; he's going to show scars on his hand where the knife severed almost all of his fingers off, scars on his back where he was stabbed on the back, and we're going to hear about how bloody this confrontation was, how the family was at risk, and how the individual who came into the house with a knife was intoxicated." This proffer did not include any indication that Estrada could testify to what precisely the defendant saw during the altercation.

The trial court ultimately sustained the state's relevancy objection to the offer of proof, without hearing Estrada testify. It ruled that the offer of proof was not relevant to what the jury had to decide, stating that it "thought [the trial court] was going to hear an offer of proof concerning that [the victim] was somehow involved in a prior altercation or this defendant heard about [the victim] being involved in a stabbing incident and was fearful," and that the defendant was "basically saying then that if somebody's charged with a violent assault, like we are here, which ended up in a murder, and they're pleading self-defense . . . that every episode that he or she was exposed to that has no bearing whatsoever on the deceased in the case on trial . . . the jury should hear . . . ."

We first set forth our standard of review. "As we recently observed, [a] defendant's right to present a defense does not include a right to present evidence that properly is excluded under the rules of evidence. . . . The sixth amendment to the United States consti-

tution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Abreu*, 106 Conn. App. 278, 282, 941 A.2d 974, cert. denied, 286 Conn. 919, 946 A.2d 1249 (2008).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 23, 1 A.3d 76 (2010). "[A]buse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

"When a defendant charged with murder asserts that he killed in self-defense, his state of mind—the existence and reasonableness of apprehension of such violence by the deceased as to justify the defensive measures adopted—becomes material." (Internal quotation marks omitted.) *State* v. *Collins*, 68 Conn. App. 828, 832, 793 A.2d 1160, cert. denied, 260 Conn. 941, 835 A.2d 58 (2002). "We have articulated the requirements of self-defense as follows. A person may justifiably use deadly physical force in self-defense pursuant to [General Statutes] § 53a-19 (a) only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel

the victim's alleged attack, is a subjective-objective one." (Internal quotation marks omitted.) Id., 833–34.

In this case, we do not conclude that the trial court ruled on the relevancy of the defendant's proffered evidence so arbitrarily as to vitiate logic, or decided it on the basis of improper or irrelevant factors. The two proffered witnesses could not testify to exactly what the defendant saw in the fatal knife fight, or the nature or degree to which the experience subjectively affected him. Moreover, the testimony of Curtis, a private investigator who was not even present at the scene of the altercation when it occurred, would presumably be riddled with hearsay problems had she been permitted to testify at trial. We also note that we need not decide whether evidence regarding this dispute would have been admissible had it been offered through the defendant's testimony because this was not the manner in which the defense offered it.

Ultimately, the knife fight incident occurred more than one decade before the events of the present case took place. Thus, it was remote in time from the present case. Further, in addition to the fact that the prior incident did not involve the victim in this case in any capacity, the prior incident did not feature the defendant as an actual participant in the knife fight. Moreover, as noted previously, a substantial question regarding the admissibility of this evidence could have arisen, thereby interfering with the orderly administration of the trial. Finally, the trial court made clear its concern that accepting the defendant's theory of relevance would mean that whenever a person charged with a violent assault alleges that he or she acted in self-defense, then every violent episode that he or she was exposed to throughout his or her life would be admissible evidence. In light of the fact that we are guided in abuse of discretion review not by "whether we would reach the same conclusion in the exercise of our own judgment, but only [by] whether the trial court acted reasonably"; (internal quotation marks omitted) *State* v. *Riddick*, 61 Conn. App. 275, 282, 763 A.2d 1062, cert. denied, 255 Conn. 946, 769 A.2d 61 (2001); we conclude that the trial court acted reasonably in excluding this particular evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant's brief to this court includes two additional claims: (1) the trial court improperly denied his motion to suppress the fruits of a warrantless search and seizure; and (2) the trial court improperly charged the jury when, pursuant to the Judicial Branch's pattern jury instructions on self-defense, it engrafted the language, "honestly and sincerely," to define the defendant's "actual belief" as to both the necessity to use force and the necessary degree of force.

With regard to the former claim, the defendant withdrew it at oral argument before this court. With regard to the latter claim, the defendant conceded at oral argument that the recent decision in *State* v. *O'Bryan*, 318 Conn. 621, 123 A.3d 398 (2015), in which our Supreme Court held that the "honestly and sincerely" language constituted "an accurate statement of the

law" and was thus not error, is controlling. Id., 634. "[I]t is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law and that the Appellate Court . . . [is] bound by our precedent." *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010). The defendant noted to this court, however, that he preserves this claim for further appeal. Because we believe *Stuart* is controlling, further review of this claim is not warranted.

[2] In the defendant's written statement regarding the events leading up to the victim's death, the victim, who appeared to the defendant to be under the influence of crack cocaine, attacked the defendant with a kitchen knife, resulting in a struggle on the victim's bedroom floor until the defendant wrestled the knife away from him. The defendant stated that he then stabbed the victim three times in the arm because the victim would not get off of him, at which point the victim walked over to a night stand, retrieved a second knife, and proceeded to move toward the defendant again. The defendant stated that he responded by stabbing the victim "a few times in the stomach area of his body" and ultimately left him in the bedroom, where the victim died.

[3] A reviewing court must apply the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), to decide whether an impropriety denied the defendant his due process right to a fair trial. These factors include a consideration of the extent to which the impropriety was invited by defense counsel's conduct or argument, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the strength of any curative measures taken, and the strength of the state's case. Id. Because we determine that no impropriety occurred, we do not engage in this analysis.

[4] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

[5] General Statutes § 54-84 (a) provides in relevant part: "Any person on trial for crime . . . may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official . . . ."

[6] We note that although the defendant also asserts in his brief to this court that the prosecutor improperly commented on the defendant's interest in the outcome of the case, the defendant frames this assertion not as a separate claim of prosecutorial impropriety, but as additional support for his contention that the prosecutor impermissibly commented on the defendant's failure to testify. In his brief, the defendant states: "Improperly arguing the nontestifying defendant's interest in the outcome, in view of *State* v. *Medrano*, [308 Conn. 604, 65 A.3d 503 (2013), which was decided] less than ten months before, made the impropriety far more severe." Because, as previously discussed, we do not find that the prosecutor's challenged remarks constituted impropriety, we need not address this assertion by the defendant.

[7] For example, in one instance, the following exchange took place between the defendant's counsel and Gill:

"Q. Now, with regard to—there were several stab wounds on the right elbow of [the victim]; is that correct?

"A. Correct.

"Q. And they were clustered right around here?

"A. Yes, around the elbow.

"Q. Okay. Is that consistent with somebody—well, let me have the defendant stand up and—and model with me to see if it's consistent with his findings. . . .

"Q. If I—if [the victim], who's about this height, had the defendant in a headlock like this, and the defendant had a knife in his right hand, and—[the defendant]—and would stab him here, would that be consistent with your findings?

"A. Yes."

[8] To the extent that the defendant claims that there was no evidence in the record for the prosecutor to properly allude to the defendant and the victim being drug addicts, we disagree. For example, there was testimony that the victim regularly attended a local clinic to receive daily methadone treatments, and would often drive the defendant and his wife to the clinic for their treatments as well. As further testimony conveyed, methadone is used to treat opioid dependence. Accordingly, it was not improper for the prosecutor to ask the jury to infer that the defendant and the victim were

both drug addicts.

[9] Additionally, the defendant's brief to this court states: "The [trial] court permitted Detective Wuchek . . . to testify over repeated defense objection, regarding interview techniques, verbal and physical indicators of untruthfulness, and the reasons that suspects would employ deceptive strategies and make inconsistent statements. Body language and suspect motivations are not a proper subject for expert testimony. . . . In the present case, admission of Detective Wuchek's expert testimony was unreasonable, untenable, and in clear contravention of Connecticut precedent. It is black letter law that juries are the sole arbiters of credibility, unaided by experts to help them decide truthfulness. Such expert testimony is not only unhelpful and unnecessary . . . but it may actually be counterproductive."

[10] The entirety of the footnote in *Lapointe* is as follows: "[Detective Paul] Lombardo [the police interrogation witness] testified at length regarding the petitioner's body language during the interrogation. Lombardo told the jury that, in his experience, the petitioner's passivity and failure to object loudly, as well as the way he sat in 'a runner's position' and wrung his hands, was indicative of 'someone who [was] being deceptive or trying to hide something.' It bears mention, however, that, at the petitioner's first habeas trial, Richard Leo, a leading authority on police interrogation methods and false confessions, testified that the commonly held belief among police officers that deception can be determined merely by observing someone's body language is 'totally pseudoscientific . . . . [I]f somebody is slumped over, if somebody is passive, if somebody utters quiet denials, if somebody is in a runner's position, somebody is sweating, evasive or nervous, that is not necessarily indicative of guilt . . . .' Leo's observation that the police officers make poor lie detectors has been confirmed in a number of recent studies. See, e.g., G. Gudjonsson, 'False Confessions and Correcting Injustices,' 46 New Eng. L. Rev. 689, 696 (2012) ('[c]oncerns have been raised that the [Reid behavioral analysis interview] indicators represent little more than common-sense beliefs about deception that are contradicted by scientific studies and place innocent . . . suspects at risk of being misclassified and giving a false confession'); R. Leo, 'False Confessions: Causes, Consequences, and Implications,' 37 J. Am. Acad. Psychiatry L. 332, 334 (2009) ('[S]ocial scientific studies have repeatedly demonstrated across a variety of contexts that people are poor human lie detectors and thus are highly prone to error in their judgment about whether an individual is lying or telling the truth. Most people get it right at rates that are no better than chance [that is, 50 percent] or the flip of a coin. Moreover, specific studies of police interrogators have found that they cannot reliably distinguish between truthful and false denials of guilt at levels greater than chance; indeed, they routinely make erroneous judgments. The method of behavior analysis taught by [one well established] police training firm . . . has been found empirically to lower judgment accuracy, leading [two researchers] to conclude that the [foregoing method of behavior analysis] may not be effective—and, indeed, may be counterproductive—as a method of distinguishing truth and deception . . . .' [Citation omitted; footnotes omitted; internal quotation marks omitted.]); J. Masip et al., 'Is the Behaviour Analysis Interview Just Common Sense?,' 25 Applied Cognitive Psychol. 593, 595 (2011) ('[T]he behavioural indicators of deception [established by earlier research] do not coincide with the scientific evidence accumulated over several decades of [more recent] empirical research. . . . [More recent research reveals] that observers' accuracy in judging the veracity of truthful and deceptive [video-recorded] statements was *lower* if the observers had previously been trained to detect deception using . . . cues [established by that earlier research] than if they had not been trained.' [Emphasis in original.]). We acknowledge Leo's testimony and the foregoing related scholarly articles merely to point out that any testimony by Lombardo at a new trial concerning the petitioner's purportedly incriminating body language may well be subject to substantial impeachment, thereby minimizing or even eliminating whatever adverse effect that testimony might have had on the petitioner at his criminal trial." *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 332–33 n.83.

[11] An objection on the ground of relevance without further elucidation could have been construed by the trial court in a number of ways. For instance, the defendant could have meant that police interrogation tactics in general are irrelevant to the issues in the case, or that the witness' reasons for studying interviewees' body language to determine truthfulness is irrelevant because such a determination is a core jury function. In any event, the trial court should not have been expected to construe the vague objection

as an attack on the inherent reliability of Wuchek's testimony.

[12] We note that the defendant's objection was tied explicitly to the officer's training and experience, and was not a reference to the lack of foundation regarding the reliability of such evidence. It is unclear from his brief to this court whether the defendant is now asserting a claim that is based on this last objection. If so, this specific claim is confined to half of a single sentence, wherein the defendant argues that "[t]he court abused its discretion in determining . . . that the state had laid an adequate foundation for admission." As "[i]t is well settled that [w]e are not required to review claims that are inadequately briefed" and that "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly"; (internal quotation marks omitted) *Lucarelli* v. *Freedom of Information Commission*, 136 Conn. App. 405, 407 n.1, 46 A.3d 937, cert. denied, 307 Conn. 907, 53 A.3d 222 (2012); to the extent that the defendant attempts to raise this claim, we deem it inadequately briefed and, thus, abandoned.

[13] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). "In [*Porter*], we adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]. We noted therein two requirements established under *Daubert*. First, [we noted] that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, [we noted that] the . . . scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 215, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). We note that in *Lapointe*, our Supreme Court suggested, without deciding, that this type of evidence is scientific in nature. See footnote 10 of this opinion.

[14] As previously noted, after Wuchek testified that "[b]ody language helps me gauge the truthfulness of people's answers," the defendant's counsel objected, stating: "The jury has seen a videotape of the entire interview. The witness' interpretation of my client's credibility is—is taking on the jury's job."

[15] In so concluding, we do not mean to suggest an opinion as to whether we believe this is a proper topic for expert testimony because, as previously discussed, an objection to this type of testimony on the ground that it is inherently unreliable was not properly preserved at trial.

[16] The defendant's first ground for his objection to the autopsy photographs was hearsay. The ruling on that ground is not being challenged in this appeal.

———————————————